IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA DUKE, | ) | Case No. 5:21-cv-39 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Lisa Duke, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her application for disability insurance benefits ("DIB") under Title II

of the Social Security Act.  Duke challenges the Administrative Law Judge's ("ALJ") negative

findings, contending that the ALJ misevaluated the opinion evidence and her subjective

symptom complaints.  However, because the ALJ applied proper legal standards and reached a

decision supported by substantial evidence, I recommend that the Commissioner's final decision

denying Duke's application for DIB be affirmed.

## I.    Procedural History

Duke applied for DIB on November 27, 2018.  (Tr. 173).[2]  Duke alleged that she became

disabled on January 1, 2016, due to: (i) postural orthostatic tachycardia syndrome ("POTS");

(ii) anxiety; (iii) hiatal hernia; (iv) obesity; (v) asthma; (vi) hyperlipidemia; (vii) anemia;

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).
[2] The administrative transcript appears in ECF Doc. 10 (Tr. 1-1078), ECF Doc. 10-1 (Tr. 1079-2181),
ECF Doc. 10-2 (Tr. 2182-3227), ECF Doc. 10-3 (Tr. 3228-3885), and ECF Doc. 10-4 (Tr. 3886-4002).

(viii) colitis; (ix) gastroesophageal reflux disease; and (x) esophageal erosions and eosinophilia esophagitis.  (Tr. 173, 192).  The Social Security Administration denied Duke's application initially and upon reconsideration.  (Tr. 77-94, 96-111).  Duke then requested an administrative hearing.  (Tr. 120).

ALJ Paula Goodrich heard Duke's case on March 31, 2020 and denied the claim in a May 6, 2020 decision.  (Tr. 12-26, 37-76).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Duke had the residual functional capacity ("RFC") to perform light work, except that:

> [Duke] can lift and/or carry (including upward pulling) twenty pounds occasionally and ten pounds frequently.  She can sit (with normal breaks) for a total of about six hours and stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday.  [Duke] can never climb ladders, ropes, or scaffolds, but she can frequently kneel, crouch, drawl, and climb ramps and stairs.  She must avoid concentrated exposure to extreme heat and cold.  She must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gases, and poor ventilation.  [Duke] must avoid commercial driving, hazardous machinery, and unprotected heights.  She must avoid loud and very loud work environments.  [Duke] is able to perform simple, routine tasks in a work environment where there are no tasks that involve high production quotas or fast-paced production demands.  There can be only occasional changes in workplace tasks or duties, with any such changes being gradually introduced.

(Tr. 19).  Based on vocational expert testimony that an individual with Duke's age, experience, and RFC could work as a merchandise marker, officer helper, and sorter, the ALJ determined that Duke was not disabled.  (Tr. 25-26).  On November 3, 2020, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On January 7, 2021, Duke filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Duke was born on June 7, 1969 and was 46 years old on the alleged onset date.  (Tr. 77, 173).  She obtained her GED in 1987 and had no vocational training.  (Tr. 193).  He had past work as an auto parts purchaser, sales representative, banker, teller, and bank manager trainee, all of which the ALJ determined she was unable to perform.  (Tr. 25, 48-50, 52-54).

### B.     Relevant Medical Evidence

The ALJ decision summarized the relevant medical evidence.  (Tr. 20-22).  Duke doesn't challenge the way the ALJ characterized the objective medical evidence summarized in her decision.  *See generally* ECF Doc. 12.  And independent review doesn't reveal any material inconsistencies between the ALJ's summary and the record before this court.  *Compare* (Tr. 20-22), *with* (Tr. 278-4002).  Thus, the court adopts and incorporates by reference the ALJ's summary of the medical evidence.[3]  The ALJ's summary of the medical evidence is as follows:

> The record reflects that [Duke] had a history of several conditions predating the alleged onset date in January 2016, including asthma and anxiety (1F [Tr. 278-1242]).  In January 2016, [Duke] reported having dizziness, fatigue, vision changes, and lightheadedness with heart racing (1F/736 [Tr. 1013]).  A tilt table test and skin nerve biopsy showed that [Duke] had POTS and small fiber neuropathy (1F/736 [Tr. 1013]).  She demonstrated normal cognition, motor function, sensation, reflexes, and coordination (1F/742, 743 [Tr. 1019-20]).  [Duke] later displayed normal gait and stride (1F/781 [Tr. 1058]).  She was prescribed medication, compression stockings, and lifestyle modifications (1F/743 [Tr. 1020]).  In a later exercise test, [Duke] had a peak functional capacity of 6.5 METS and peak heart rate of 142 beats per minute (1F/795 [Tr. 1072]).  While the exercise test had to be stopped due to dizziness, she demonstrated only mild functional impairment for her age. (1F/795 [Tr. 1072]).

---

[3] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

Later in the spring, [Duke] went to the hospital with trouble speaking and right facial tingling (1F/819 [Tr. 1096]).  She had taken medi[c]ation just prior to the symptoms appearing (1F/823 [Tr. 1100]).  She demonstrated normal neurological findings (1F/830, 831 [Tr. 1107-08]).  [Duke's] POTS exams were stable through the spring (1F/858-868; 883-888 [Tr. 1135-1145, 1160-1165]).

[Duke] had a hospital visit in August with coughing and shortness of breath (1F/898 [Tr. 1175]).  She displayed right chest pain, but normal breath sounds and effort (1F/90[0] [Tr. 1177]).  She was sent home with a Z-Pak prescription (1F/901 [Tr. 1178]).  [Duke] returned to the hospital the next day with palpitations, but she had clear lungs (1F/920, 922 [Tr. 1197, 1199]).  A chest CT showed a mass consistent with an infection and she had significant anemia (1F/924 [Tr. 1201]).  She was stabilized and discharged to follow-up for a bronchoscopy (1F/924 [Tr. 1201]).  She was later given antibiotics to treat pneumonia (1F/949 [Tr. 1226]).

In October, [Duke] had an asthma check-up where she said she was doing well since her last visit, although she noted extreme fatigue and dyspnea (2F/143 [Tr. 1385]).  On exam, she was obese, but she had clear lungs (2F/144 [Tr. 1386]).  A chest CT documented resolution of her pulmonary infiltrate and she had stable tiny right lung nodules (2F/145 [Tr. 1387]).  Later that month, [Duke] said she had not needed Ativan for anxiety for some time (2F/135 [Tr. 1377]).  She displayed appropriate mood and affect (2F/137 [Tr. 1379]).  The following month, [Duke] reported worsening tingling and a headache.  (2F/128 [Tr. 1370]).  She exhibited normal neurological functioning on exam (2F/129 [Tr. 1371]).  A brain CT showed no changes in inflammatory sinusitis (2F/130 [Tr. 1372]).

[Duke] had a December hospital visit for chest pain and dizziness, but she had normal cardiac findings and lungs (2F/119, 120 [Tr. 1361-62]).  Her symptoms were likely due to anxiety and she improved with Ativan (2F/122 [Tr. 1364]).  She was to begin using Zoloft as well (2F/122 [Tr. 1364].  [Duke] later noted decreased anxiety and palpitations (2F/112, 113 [Tr. 1354-55]).

During early 2017, [Duke] reported increased palpitations lasting for only a second (2F/105 [Tr. 1347]).  Her exam was unremarkable (2F/107 [Tr. 1349]).  She was advised to exercise regularly and follow a heart-healthy diet (2F/110 [Tr. 1352]).  She also had an episode of bronchitis, for which she was prescribed steroids and antibiotics (2F/100 [Tr. 1342]).  [Duke] said she had increased stress and she required use of Ativan three to for times per week, which was effective in controlling her anxiety (2F/96 [Tr. 1338]).

In February 2018, [Duke] went to the hospital with chest pain radiating down her left arm (2F/58 [Tr. 1300]).  She had normal pulmonary and neurological findings (2F/59 [Tr. 1301]).  An EKG revealed sinus bradycardia with no ischemic changes and normal chest x-rays (2F/60, 61 [Tr. 1302-03]).  Also during early 2018, [Duke] was taking Antivert for periodic lightheadedness (6F/569 [Tr.

3116]).  During May, [Duke] reported that she had shortness of breath, feeling warm, tingling, and facial numbness (2F/47 [Tr. 1289]).  Her exam was normal and she was to have further testing (2F/49 [Tr. 1291]).

In July, [Duke] had a hospital visit for chest pain with left arm and jaw soreness (2F/43 [Tr. 1285]).  She demonstrated normal breath sounds and cardiac findings. (2F/44 [Tr. 1286]).  She was stabilized and she was discharged (2F/45 [Tr. 1287]).  [Duke] also had a sleep study and she was diagnosed with sleep apnea (2F/33 [Tr. 1275]).  She was given advice on losing weight (2F/21-23 [Tr. 1263-65]).  She also had a hospital visit for palpitations, chest pain, and shortness of breath (2F/37 [Tr. 1279]).  [Duke] normal exam findings (2F/37 [Tr. 1279]).  She was given an increased dose of Celexa and she was to decrease use of Ativan (2F/38 [Tr. 1280]).  In September, she said her palpitations had improved with resolution of stressors (2F/25 [Tr. 1267]).

Into early 2019, [Duke] was advised that she had to [increase] use [of] her CPAP [machine] (5F22 [Tr. 2488]).  She remained obese as well and she was advised to lose weight (5F/18 [Tr. 2484]).  During January, she complained of anxiety and chest pain, but she said she felt better (5F/11 [Tr. 2477]).  She had a recent hospital visit, but her exam was normal and her palpitations were relieved with medication for anxiety and gastrointestinal pain (5F11; 6F/743-778 [Tr. 2477, 3290-3325]).  Aside from trace pitting edema and a BMI of 32, her exam was normal (5F/13 [Tr. 2479]).  The next month, [Duke] underwent a change of asthma medications and she received a Prednisone taper for an asthma exacerbation with some coughing and scattered wheezes (5F/9 [Tr. 2475]).

During a March exam, [Duke reported that] she had facial numbness and sweating during an [anxiety] episode after prolonged standing (6F/815 [Tr. 3362]).  She said she had five to seven headaches per week (6F/819 [Tr. 3366]).  She demonstrated normal cognition and motor function, although she had decreased sensation in her left foot due to previous surgery (6F/820 [Tr. 3367]).  She exhibited normal coordination and gait (6F/820 [Tr. 3367]).  [Duke] continued using compression stockings and she began taking Florinef (6F/821 [Tr.3368]).  The next month, she was advised to begin a ketogenic diet to lose weight (8F/15 [Tr. 3626]).

In May, [Duke] said she was doing well with increased energy (10F/167 [Tr. 3812]).  Her BMI was down to 30.99 (10F/167 [Tr. 3812]).  She demonstrated normal exam findings (10F/167 (Tr. 3812]).  In a check-up for POTS, [Duke] demonstrated lucid and calm mental status with clear speech and goal directed thoughts (10F/185 [Tr. 3830]).  She exhibited normal strength, gait, and stride (10F/185 [Tr. 3830)].

Later in May, [Duke] noted increased lightheadedness, palpitations, and fatigue (10F/193 [Tr. 3838]).  The episodes lasted for only a second and she had chest discomfort at times (10/194 [Tr. 3839]).  While she had trace pitting edema,

Case: 5:21-cv-00039-PAG  Doc #: 14  Filed:  01/11/22  5 of 20.  PageID #: 4115

3116]).  During May, [Duke] reported that she had shortness of breath, feeling warm, tingling, and facial numbness (2F/47 [Tr. 1289]).  Her exam was normal and she was to have further testing (2F/49 [Tr. 1291]).

In July, [Duke] had a hospital visit for chest pain with left arm and jaw soreness (2F/43 [Tr. 1285]).  She demonstrated normal breath sounds and cardiac findings. (2F/44 [Tr. 1286]).  She was stabilized and she was discharged (2F/45 [Tr. 1287]).  [Duke] also had a sleep study and she was diagnosed with sleep apnea (2F/33 [Tr. 1275]).  She was given advice on losing weight (2F/21-23 [Tr. 1263-65]).  She also had a hospital visit for palpitations, chest pain, and shortness of breath (2F/37 [Tr. 1279]).  [Duke] normal exam findings (2F/37 [Tr. 1279]).  She was given an increased dose of Celexa and she was to decrease use of Ativan (2F/38 [Tr. 1280]).  In September, she said her palpitations had improved with resolution of stressors (2F/25 [Tr. 1267]).

Into early 2019, [Duke] was advised that she had to [increase] use [of] her CPAP [machine] (5F22 [Tr. 2488]).  She remained obese as well and she was advised to lose weight (5F/18 [Tr. 2484]).  During January, she complained of anxiety and chest pain, but she said she felt better (5F/11 [Tr. 2477]).  She had a recent hospital visit, but her exam was normal and her palpitations were relieved with medication for anxiety and gastrointestinal pain (5F11; 6F/743-778 [Tr. 2477, 3290-3325]).  Aside from trace pitting edema and a BMI of 32, her exam was normal (5F/13 [Tr. 2479]).  The next month, [Duke] underwent a change of asthma medications and she received a Prednisone taper for an asthma exacerbation with some coughing and scattered wheezes (5F/9 [Tr. 2475]).

During a March exam, [Duke reported that] she had facial numbness and sweating during an [anxiety] episode after prolonged standing (6F/815 [Tr. 3362]).  She said she had five to seven headaches per week (6F/819 [Tr. 3366]).  She demonstrated normal cognition and motor function, although she had decreased sensation in her left foot due to previous surgery (6F/820 [Tr. 3367]).  She exhibited normal coordination and gait (6F/820 [Tr. 3367]).  [Duke] continued using compression stockings and she began taking Florinef (6F/821 [Tr.3368]).  The next month, she was advised to begin a ketogenic diet to lose weight (8F/15 [Tr. 3626]).

In May, [Duke] said she was doing well with increased energy (10F/167 [Tr. 3812]).  Her BMI was down to 30.99 (10F/167 [Tr. 3812]).  She demonstrated normal exam findings (10F/167 (Tr. 3812]).  In a check-up for POTS, [Duke] demonstrated lucid and calm mental status with clear speech and goal directed thoughts (10F/185 [Tr. 3830]).  She exhibited normal strength, gait, and stride (10F/185 [Tr. 3830)].

Later in May, [Duke] noted increased lightheadedness, palpitations, and fatigue (10F/193 [Tr. 3838]).  The episodes lasted for only a second and she had chest discomfort at times (10/194 [Tr. 3839]).  While she had trace pitting edema,

[Duke] exhibited normal neurological findings (10F/197 [Tr. 3842]).  [Duke] had
stopped taking Propranolol due to asthma and she was prescribed a low dose of
Diltiazem (10F/199 [Tr. 3844]).  Through the summer, [Duke] had continued
dizziness and fatigue, but her exam findings remained stable (10F/206-231 [Tr.
3851-3876]).  She stopped taking Diltiazem due to shortness of breath, but she
remained on Florinef (10F/224 [Tr. 3869]).

[Duke] went to the emergency department in October with chest pain and
shortness of breath while working in the yard (10F/242 [Tr. 3887]).  The
symptoms improved when sitting down (10F/242 [Tr. 3887]).  She exhibited chest
wall tenderness and occasional expiratory wheeze, but otherwise clear lungs
(10F/244 [Tr. 3889]).  An EKG was normal (10F/246 [Tr. 3891]).  She was
discharged with antibiotics for potential bronchitis (10F/247 [Tr. 3892]).  Two
months later, [Duke] said she had increasing fatigue and some dizziness, but she
was doing well overall (10F/324 [Tr. 3969]).  Her physical exam was
unremarkable aside from trace pitting edema (10F/328 [Tr. 3973]).

(Tr. 20-22).

## C.   Relevant Opinion Evidence

On January 15, 2020, Thomas Krupitzer, MD, issued a one-page opinion on Duke's

ability to do work-related activities, in which Dr. Krupitzer checked boxes indicating Duke's

limitations.  (Tr. 3993).  The checked boxes indicated that Duke could: (i) stand for up to three

hours in an eight-hour workday; (ii) sit for six hours in an eight-hour workday; (iii) occasionally

lift ten pounds; and (iv) frequently lift less than ten pounds.  *Id.*  Dr. Krupitzer also checked

boxes indicating that Duke needed to shift at will between standing/walking, lie down at

unpredictable times, and on average would be absent from work twice per month.  *Id.*

Dr. Krupitzer did not provide any explanation for his stated limitations, but in response to the

question, "What is the earliest date you estimate these limitations began as described?" he stated:

"Diagnosed with POTS 2016."  *See id.*  Krupitzer listed Duke's diagnoses (asthma and POTS),

her symptoms (cough, wheeze, shortness of breath, chest pain, and palpitations), her treatment

(medications), and his medical findings ("fast heart rate and low blood pressure").  *Id.*

### D.      Relevant Testimonial Evidence

Duke testified at the administrative hearing.  (Tr. 46-71).  Duke testified that her POTS was what most prevented her from returning to work.  (Tr. 55).  Duke stated her POTS caused her to get dizzy while standing, for which she would need to either sit or lie down for between five minutes and an hour.  (Tr. 55, 57).  She stated POTS would also: (i) affect her memory, making it had to maintain attention or retain information; and (ii) caused depression and anxiety.  (Tr. 55-56).  When she suffered anxiety attacks, Duke stated she would need to isolate, put on a noise cancellation device, and lie down for up to two hours.  (Tr. 57).  She suffered both anxiety and dizzy episodes at least once per day, and she'd lie down on average three times per day for up to an hour.  (Tr. 57-58).  Sometimes (four to five days per month) she'd spend the whole day in bed.  (Tr. 58-59).

Duke testified that she could sit for between 20 and 60 minutes, depending on the surface.  (Tr. 62).  Duke stated her concentration problems occurred once or twice a day.  (Tr. 64).  And she stated that she could be on her feet for up to two hours.  (Tr. 66).

Duke testified that one some days, she could wash dishes, do laundry, go up and down stairs, and cook dinner as normal.  (Tr. 59-60).  On others, the hot water from washing dishes would trigger a POTS episode and she'd need to sit or lie down with her legs raised, she couldn't go down the stairs, and she'd sleep with an ice pack on her chest.  (Tr. 59-61)*.* The heat and standing associated with cooking would also trigger an episode.  (Tr. 60).  Regardless of the day, Duke testified she'd have POTS episodes throughout the day.  *Id.*

III.    **Law & Analysis**

    A.    **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Weighing of the Opinion Evidence

Duke argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in her evaluation of Dr. Krupitzer's opinion. ECF Doc. 12 at 10-13. Duke argues the ALJ failed to apply proper legal standards because the ALJ failed to adequately explain her reasons for finding Dr. Krupitzer's opinion unpersuasive, as: (i) objective findings of normal strength, coordination, and gait are "irrelevant to the condition of POTS"; (ii) the ALJ conceded that the record documented symptoms that were consistent with POTS; (iii) the ALJ did not explain why Duke's symptoms would not result in the need to change positions or lie down; and (iv) the ALJ did not compare Dr. Krupitzer's opinion with Robert Wilson's, DO, corroborating treatment notes. ECF Doc. 12 at 12. And Duke argues that the ALJ erred by not considering all of the regulatory factors, including consistency and supportability. ECF Doc. 12 at 13.

The Commissioner disagrees, arguing that the ALJ properly and adequately considered supportability and consistency. ECF Doc. 13 at 8-9. The Commissioner argues that Duke has not indicated which of Dr. Wilson's treatment notes substantiate Dr. Krupitzer's opinion, and a review of them suggests the opposite. ECF Doc. 13 at 10. Alternatively, the Commissioner argues that any ALJ error was harmless because Dr. Krupitzer failed to explain the basis for the limitations he assessed, such that it was patently deficient. *Id.*

9

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[4]. According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Although a close question, I find that the ALJ applied proper legal standards in her evaluation of Dr. Krupitzer's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ explained that she found Dr. Krupitzer's opinion unpersuasive because:

> While [Dr. Krupitzer] treated [Duke], the evidence did not document such substantial limitations. Indeed, [Duke] demonstrated generally normal strength, coordination, and gait. While she had dizziness when standing for long periods, the record did not document the need to change positions often or to lay down. While Dr. Krupitzer noted a fast heartrate and low blood pressure to support his assessment, the statements of [Duke's] cardiologist, who treated [Duke's] POTS, did not offer such extreme limitations (12F [Tr. 3994]). Likewise, [Duke's] asthma was largely controlled and did not establish such substantial restrictions.

(Tr. 24). It is apparent from the ALJ's single-paragraph analysis of Dr. Krupitzer's opinion that she considered the supportability of his opinion, or how well his own testing and clinical

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

observations supported his opinions on Duke functional capabilities.  At least that's what we can infer from the ALJ's statements: "the evidence did not document such substantial limitations;" that Duke "demonstrated generally normal strength coordination and gait;" and that "the record did not document the need to change positions often or to lay down."  (Tr. 24).  The regulation requires the ALJ to "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions."  20 C.F.R. § 404.1520c(c)(1).  The ALJ's brief comments in her discussion of Dr. Krupitzer's opinion were a rather weak attempt to satisfy the regulation because although she generically referred to objective findings, she cited no specific office notes generated by Dr. Krupitzer – at this part of the ALJ decision – in which those findings might be found.  On the other hand, if the ALJ concluded that the doctor's notes did *not* demonstrate something, it is not possible to specifically cite something that is not present.  But reading the decision as a whole and with common sense, it is plain that the ALJ's citation of numerous treatment records – some of which Dr. Krupitzer generated – reflects that she did consider what Krupitzer found in the treatment setting and compared that to his disability opinion.  *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.").  That is adequate to satisfy the regulatory requirement that the supportability of the opinion be analyzed.

Further, when the ALJ stated: "While Dr. Krupitzer noted a fast heartrate and low blood pressure to support his assessment, the statements of [Duke's] cardiologist, who treated [Duke's] POTS, did not offer such extreme limitations (12F [Tr. 3994])," the ALJ fulfilled her requirement to offer a reason why Krupitzer's opinions were found to be inconsistent with evidence from other medical sources.  20 C.F.R. § 404.1520c(c)(2); (Tr. 24).  Although not

extensively expressed, the ALJ satisfied the requirement that she analyze the consistency of the medical source opinion with the evidence from other sources.

Duke contends that the ALJ's observation that Duke's medical records showed objective findings of generally normal strength, coordination, and gait is "irrelevant to the condition of POTS." ECF Doc. 12 at 12. And she is critical that the ALJ "neglected to compare Dr. Krupitzer's opinion to the findings of Dr. Wilson, who specializes in POTS and treated Plaintiff since at least 2016 for POTS." *Id.* But a review of one of Dr. Wilson's original treatment notes reveals, under the heading "Gait," the following: "*Rises and sits from chairs without incident*." (Tr. 1139 (emphasis added)). On that same page of the record, in Dr. Wilson's recommendations to Duke, he stated, "Make all postural changes from lying to sitting or sitting to standing slowly." *Id.* Thus, it would appear, contrary to Duke's lay opinion, that Dr. Wilson thought that the consideration of "gait" included the ability to rise and sit from chairs. And the ALJ cited this record in conjunction with her finding that, "the Claimant's POTS exams were stable through the spring." (Tr. 21). Thus, while not making a same-paragraph comparison of the findings of Dr. Wilson and Dr. Krupitzer, it is apparent that the ALJ did indeed compare the findings of the two treating doctors. *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79 (stating that there is no requirement that the ALJ incorporate all of the information upon which she relied into a single tidy paragraph).

Duke also argues that the ALJ failed to consider all of the criteria required by the regulations for the evaluation of medical source opinions. ECF Doc. 12 at 13. However, with the adoption of the current regulatory framework, an ALJ is not obligated to explain how the other criteria were evaluated: "We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how

12

we consider medical opinions . . . in your case record." 20 C.F.R. § 404.1520c(b)(2).  Thus, it is not a basis for remand that the ALJ only explained how she considered the supportability and consistency criteria.

Although I do not find an error in the ALJ's analysis of the opinion of Dr. Krupitzer, that is not so say that the ALJ's explanation of her analysis aided the court – as a future reviewer – in our analysis of her reasoning.  As noted above, the ALJ's minimalist description of her basis for discounting Dr. Krupitzer's opinion didn't distinguish between one set of treatment notes and another, but made blanket statements that Dr. Krupitzer's findings were not documented in the record and went on to discuss some objective findings the ALJ believed supported her reasoning without identifying the source.  (Tr. 24).  In the analysis paragraph concerning Dr. Krupitzer's opinion, the ALJ didn't say what treatment notes indicated normal strength, coordination, and gait; the undersigned had to review records cited in other parts of the ALJ's decision to find them.  And even had the ALJ done so, the ALJ nevertheless didn't explain why those objective findings contradicted Dr. Krupitzer's opinion.  *Fleischer*, 774 F. Supp. 2d at 877.  Instead, the court was required to make its own inferences from the record.

Nevertheless, I find that the ALJ's minimal compliance with the regulation's articulation requirements did not cause harmful error.  *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).  An error in an ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patiently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by indirectly attacking the supportability or consistency of the opinion.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F.

13

App'x 435, 440 (6th Cir. 2010).[5]  As the Commissioner argues, Dr. Krupitzer's opinion falls in the first circumstance.  His opinion was set forth on a one-page check box form supplied by an attorney with no explanation beyond diagnoses to support it.  (Tr. 3993).  The Sixth Circuit has held that such opinions meet the patently deficient standard.  *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016).  Therefore, any claimed error the ALJ may have made in evaluating Dr. Krupitzer's opinion was harmless.  *Paradinovich v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-1888, 2021 U.S. Dist. LEXIS 213589, at *24-25 (N.D. Ohio Sept. 28, 2021) (concluding similarly).

Moreover, as the ALJ pointed out, the Krupitzer opinion was inconsistent with the medical opinion of Duke's treating cardiologist, Michael L. Amalfitano, DO, who (on an identical check box form) found none of the same limitations offered by Dr. Krupitzer.  (Tr. 24, 3994).  The inconsistency finding alone was enough to justify the ALJ's decision to discount Dr. Krupitzer's opinion.  And, contrary to Duke's argument, the ALJ was not required to find Dr. Amalfitano's opinion to be persuasive in order to use it as a basis for discounting the Krupitzer opinion.  Instead, the ALJ was free to find the two reports to be inconsistent with each other and reject them both.  And that is what it appears she did.

Thus, I find no basis for remand on account of Duke's challenge to the ALJ's evaluation of the opinion evidence.

---

[5] While the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations.  *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *12 (N.D. Ohio Sept. 29, 2020).

### C.     Subjective Symptom Complaints

Duke argues that the ALJ failed to apply proper legal standards in her assessment of Duke's subjective symptom complaints.  ECF Doc. 12 at 13-17.  Duke argues that the ALJ failed to apply proper legal standards because the ALJ cited evidence that corroborated Duke's symptoms yet did not explain why that evidence did not support her stated symptoms.  ECF Doc. 12 at 14-15.  Duke further argues that the ALJ procedurally erred by not explaining how she considered evidence relevant to the other regulatory factors, namely, Duke's testimony of how her POTS limited her.  ECF Doc. 12 at 15-16.

The Commissioner disagrees, arguing that the reasons the ALJ gave were adequate and supported by substantial evidence in the record.  ECF Doc. 13 at 11.  The Commissioner argues that the ALJ was not required to discuss every factor, and that Duke could not rely on her subjective symptom complaints as support for why her subjective symptom complaints should be credited.  ECF Doc. 13 at 11-12.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 404.1529(c)(3).

If an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ need not explicitly discuss each of the factors. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012). And although the ALJ must discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which she relied into a single tidy paragraph. *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in her evaluation of Duke's subjective symptom complaints. 42 U.S.C. § 405; *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by: (i) assessing Duke's RFC in light of the medical evidence, her testimony, and other evidence in the record; and (ii) clearly explaining that she rejected Duke's subjective symptom complaints because her statements regarding the

intensity, persistence, and limiting effects of her symptoms were not consistent with the

objective medical evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *3-4,

11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15; (Tr. 19-24).  The ALJ provided

sufficiently clear reasons for rejecting Duke's subjective symptom complaints when she stated

that:

> The record showed ongoing short spells of dizziness, tingling, chest pain, and
> lightheadedness.  Nevertheless, she demonstrated largely normal neurological
> functioning during exams, including normal coordination and gait.  Additionally,
> with treatment, the record documented that her condition stabilized to some
> degree.  The record failed to confirm the frequency of non-functional days that
> [Duke] described in her testimony.  Moreover, while [Duke] had asthma with
> chest pain and shortness of breath at times, such symptoms appeared to resolve
> relatively well with treatment.  In terms of [Duke's] mental conditions, she had
> only intermittent complaints of anxiety and depression, with some apparent
> anxiety attacks.  She generally displayed largely normal mental status findings
> and her condition was largely controlled with medication.  Accordingly, the
> record as a whole is consistent with the finding that [Duke] could perform the
> reduced range of light work in a relatively static environment as described in the
> residual functional capacity.

 (Tr. 24); *Felisky*, 35 F.3d at 1036.  Although the ALJ wasn't required to specifically discuss

each of the regulatory factors in her decision, she specifically acknowledged that she considered

the factors set out in SSR 16-3p in evaluating Duke's subjective symptom complaints.

*Renstrom*, 680 F.3d at 1067; (Tr. 19-20).  And the ALJ acknowledged Duke's testimony of her

difficulties concentrating, non-functional days, and standing/walking limitations.  (Tr. 24).

The ALJ did not include in her reasons for discounting Duke's subjective symptom

complaints citations to evidence upon which she relied.  But reading the ALJ's decision as a

whole, we can discern what evidence the ALJ relied on from her summary of the evidence.

*Buckhannon ex rel. J.H.*, 368 F. App'x 674, 678–79; *see* (Tr. 20-24).  And I find that substantial

evidence supported the ALJ's reasons for discounting Duke's subjective symptom complaints.

42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Substantial evidence supported the ALJ's finding

that Duke's physical examination results reflected normal neurological findings.  (Tr. 21-22 (citing Tr. 1019-20, 1058, 1107-08, 1279, 1291, 1301, 1349, 1361-62, 1371, 2479, 3294, 3324, 3367, 3812, 3830, 3842, 3973)).  Substantial evidenced supported the ALJ's finding that Duke's condition stabilized with treatment, including: (i) December 20, 2019 treatment notes from her cardiologist stating her cardiac condition was "stable" (Tr. 3975); (ii) Duke's treating cardiologist's February 25, 2020 opinion that Duke had no functional limitations as a result of her cardiological impairments (Tr. 3994); and (iii) October 21, 2019 cardiac stress test results indicating that Duke performed at the average level for her age and gender (Tr. 3908).  *See* (Tr. 20-22).

The ALJ wasn't required to provide citations to support her finding that the record did not confirm Duke's testimony of non-functional days.  (Tr. 24); *see Meyer v. Comm'r of Soc. Sec.*, No. 1:12-cv-822, 2013 U.S. Dist. LEXIS 179886, at *15 (S.D. Ohio Dec. 20, 2013).  The regulations do not and could not require an ALJ to cite records depicting the absence of particular findings.  And Duke has not pointed to any evidence that would corroborate her testimony of being non-functional for days as a result of her POTS.  *See* ECF Doc. 12 at 13-17.  And independent review of the medical record did not reveal evidence corroborating Duke's testimony.

Substantial evidence supported the ALJ's finding that Duke's asthma symptoms responded well to treatment, including: (i) Duke's statements during her post-hospitalization asthma checkup that she was doing well; (ii) unremarkable respiratory exam findings through December 12, 2019; (iii) unremarkable imaging tests; and (iv) normal spirometry exam findings.  (Tr. 21-23 (citing Tr. 1197, 1199, 1286, 1291, 1301-03, 1361-62, 1385-87, 2479, 3306, 3297, 3638-39, 3812, 3854, 3873, 3889, 3973)).  And substantial evidence supported the ALJ's finding

that Duke had generally normal mental status examination results and that her mental health impairments were largely controlled with medication.  (Tr. 21-23 (citing Tr. 1019, 1058, 1338, 1354-55, 1364, 1377, 1379, 2463-64, 2477, 3324, 3293-94, 3324, 3367, 3830)); *see also* (Tr. 3648, 3744, 3773, 3789, 3812).

Because the ALJ applied proper legal standards and her conclusions were reasonably drawn from the evidence, the ALJ's evaluation of Duke's subjective symptoms complaints fell within the Commissioner's "zone of choice" and cannot be disturbed by this court.  *Mullen*, 800 F.2d at 545; *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Duke's application for DIB be affirmed.

Dated: January 11, 2022

Thomas M. Parker
United States Magistrate Judge

_____

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report

and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

20